UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Jeffrey Jay Henrikson,

                Plaintiff,                Court File No. 16-cv-1317 (MJD/LIB)

    v.

                                         **REPORT AND RECOMMENDATION**

Choice Products USA, LLC, et al.

                Defendants.

_____

       This matter came before the undersigned United States Magistrate Judge pursuant to an order of referral, [Docket No. 28], made in accordance with the provisions of 28 U.S.C. § 636(b)(1)(B), and upon Defendants' Motion to Dismiss, [Docket No. 8], and Defendants' second Motion to Dismiss, [Docket No. 21]. A hearing was held and the motions taken under advisement on September 1, 2016, [Docket No. 32].

       For the reasons set forth below, the Court recommends that Defendants' Motion to Dismiss, [Docket No. 8], be **DENIED AS MOOT**, and Defendants' second Motion to Dismiss, [Docket No. 21], be **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND AND STATEMENT OF ALLEGED FACTS[1]

       In June 2002, Jeffrey Jay Henrikson ("Plaintiff") began working for Choice Products USA, LLC ("Choice Products"), as a permanent employee. (First Amended Compl., [Docket No. 18], 2-3). Choice Products is located in Eau Claire, Wisconsin, and is the plan administrator for

---

[1] For the purposes of the present Rule 12(b)(6) motion to dismiss, the Court accepts the facts alleged in the First Amended Complaint as true and construes them in the light most favorable to Plaintiff. See, Stodghill v. Wellston Sch. Dist., 512 F.3d 472, 476 (8th Cir. 2008). Although the Court generally may not consider materials outside the pleadings, when deciding a motion to dismiss under Rule 12(b)(6), the Court may consider "'materials that are necessarily embraced by the pleadings,'" such as the documents attached to the First Amended Complaint herein. See, Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015).

the Choice Products USA, LLC Employee Benefit Plan ("the Plan"), through which its employees receive employment benefits, including medical and health care insurance.[2] (Id. at 2; Plf.'s Exh. 1, [Docket No. 18-1], 5). The Plan is governed by the Employee Retirement Income Security Program of 1974 ("ERISA"). (First Amended Compl., [Docket No. 18], 2). Benefit Plan Administrators ("BPA") is the claims administrator for the Plan. (Id.).

On July 4, 2015, Plaintiff was at his residence in Minnesota when, as part of an Independence Day celebration, Plaintiff attempted to light a "mortar-style firework." (Id. at 6, 10). It exploded, substantially injuring Plaintiff, and causing burns and other injuries to his face, shoulder, eyes, and ears. (Id.). As a result, Plaintiff received over $255,000 in medical care, and he anticipates additional related medical care and expenses in the future. (Id. at 7).

At the time of the incident, Plaintiff was enrolled in the Plan, and he submitted claims for payment of his medical expenses. (Id. at 3). BPA denied benefits on the ground that the injuries arose from a criminal act and were therefore subject to the Plan's illegal activity exclusion. (Id. at 7).  Plaintiff was not arrested or criminally prosecuted because of the explosion. (Id. at 7). Although a summary of the Plan was available to Plaintiff online, he had not received a copy of the Plan prior to this coverage dispute. (Id. at 3). The Plan, not including the cover page, notices, and table of contents, is 82 pages long; the portions explaining covered and not-covered charges appear primarily in single-spaced lines and contain numerous subdivisions. (Id. at 3-4; Plf.'s Exh. 1, [Docket No. 18-1]).

The "Charges Not Covered" section, which includes the illegal activities exclusion at issue here, is five pages long and includes paragraphs A through WW. (Plf.'s Exh. 1, [Docket

---

[2] Henrikson has designated both Choice Products and the Plan as defendants. For ease of understanding, when discussing both, this Report and Recommendation refers to them collectively as "Defendants."

No. 18-1], 20-24). The paragraph under which Plaintiff's coverage was denied is paragraph N, which excludes coverage for:

> Injury or illness which is Incurred while taking part or attempting to take part in an illegal activity, including but not limited to misdemeanors and felonies. It is not necessary that an arrest occur, criminal charges be filed, or if filed, that a conviction result. Proof beyond a reasonable doubt is not required to be deemed an illegal act. This exclusion does not apply (a) if the injury resulted from being the victim of an act of domestic violence, or (b) resulted from a medical condition (including both physical and mental health conditions).

(Id. at 21). After BPA denied benefits, Plaintiff appealed, but BPA denied his appeal. (First Amended Compl., [Docket No. 18], 7).

## II.     PROCEDURAL HISTORY

On May 18, 2015, Plaintiff filed a Complaint seeking relief under alternative theories. (Compl., [Docket No. 1]). Defendants filed a Motion to Dismiss. (Motion to Dismiss, [Docket No. 8]). Plaintiff then filed his First Amended Complaint., which was largely identical to his original Complaint.[3] (First Amended Compl., [Docket No. 18]). Because Plaintiff filed a First Amended Complaint, the Court recommends denying Defendants' first Motion to Dismiss, ([Docket No. 8]), as moot. See, Onyiah v. St. Cloud State Univ., 655 F. Supp. 2d 948, 958 (D. Minn. 2009) ("[A]s a general proposition, if a defendant files a Motion to Dismiss, and the plaintiff later files an Amended Complaint, the amended pleading renders the defendant's Motion to Dismiss moot.").

In his First Amended Complaint, Plaintiff asserted that under the Patient Protection and Affordable Care Act ("ACA"), the services he received and for which BPA denied coverage are

---

[3] The only difference between the original Complaint and the First Amended Complaint is in paragraph 42, titled "Causes of Action." In the First Amended Complaint, Henrikson removed language asking "to clarify his rights to future benefits under the Plan" and added language asking "to enjoin acts which violate ERISA and the terms of the Plan, and to obtain appropriate equitable relief." Other than that change, the First Amended Complaint is identical to the Complaint. (Compare Compl., [Docket No. 1], with First Amended Compl., [Docket No. 18]).

"essential health benefits" which health plans are required to cover unless the plan is subject to the ACA's grandfathering protections. (First Amended Compl., [Docket No. 18], 8). In the alternative, Plaintiff alleges that the Plan's illegal activity exclusion is void and unenforceable as a matter of public policy, because (1) the Plan is ambiguous as to what body of law determines whether acts are illegal for purposes of the exclusion, and (2) enforcing the exclusion would shift the costs of insuring socially acceptable conduct onto healthcare providers or onto taxpayers through injured parties availing themselves of public health and welfare funds. (Id. at 9). Third, Plaintiff asserted that lighting the firework at issue was not illegal under federal or Wisconsin law, so his acts were not illegal under the Plan and therefore were covered, despite the illegal activity exclusion. (Id. at 10). Plaintiff requested money damages, clarification of his rights under the plan, and injunctive relief requiring coverage of future medical expenses. (Id. at 10).

Following Plaintiff's First Amended Complaint, Defendants filed a second Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. (Motion to Dismiss, [Docket No. 21], 1). They contemporaneously filed a Memorandum in Support of the Motion to Dismiss. (Defs.' Mem. in Supp., [Docket No. 23]). In response, Plaintiff filed a Memorandum in Opposition to the Motion to Dismiss, and Defendants filed a Reply. (Plf.'s Mem. in Opp., [Docket No. 29]; Defs.' Reply to Response, [Docket No. 30]).

Neither party confined their arguments in those memoranda to analysis appropriate for a Motion to Dismiss under Rule 12(b)(6), nor did they clearly link their arguments to the specific claims found in the First Amended Complaint. Because these failures necessarily cause the Court to disregard some of the arguments that are not properly advanced in the present procedural context, the parties' arguments are separately described and addressed below.

### III.    DEFENDANTS' MOTION TO DISMISS [Docket No. 21]

#### A.  Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), courts "look only to the facts alleged in the complaint and construe those facts in the light most favorable to the plaintiff." Riley v. St. Louis Cty. of Mo., 153 F.3d 627, 629 (8th Cir. 1998) (citing Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 556 (8th Cir 1998)), cert. denied 525 U.S. 1178 (1999). Courts must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Aten v. Scottsdale Ins. Co., 511 F. 3d 818, 820 (8th Cir. 2008). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level," which "requires more than labels and conclusions, and a formulistic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

In the Memorandum in Support of their Motion to Dismiss, Defendants do not confine their arguments to whether Plaintiff failed in his First Amended Complaint to state a claim upon which relief may be granted. Instead, they—and Plaintiff in his Memorandum in Opposition— proceed to argue the underlying merits of this case. However, to survive dismissal under Rule 12(b)(6), Plaintiff need not prove that his arguments are winning ones; he only need show that success on the merits is more than a "sheer possibility." See, Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556.

Although Rule 12(d) allows courts to convert a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment, the general rule is that summary judgment under Rule 56 is

proper only after there has been adequate time for discovery. See, Iverson v. Johnson Gas Appliance Co., 172 F.3d 524, 530 (8th Cir. 1999). Here, where (1) Defendants have filed a Motion to Dismiss under Rule 12(b)(6); (2) neither party has requested treatment of the present motion as one for summary judgment; and (3) there has not yet been any discovery, the Court declines to convert the present 12(b)(6) motion into one for summary judgment under Rule 56. The Court will proceed to analyze the parties' arguments under Rule 12(b)(6).

Accordingly, the complaint here must "state a claim to relief that is plausible on its face." See, Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556-57). When courts undertake the "context-specific task" of determining whether a plaintiff's allegations "nudge" its claims against a defendant "across the line from conceivable to plausible," they may disregard legal conclusions that are couched as factual allegations. See Id. at 678-81.

> A court generally may not consider materials outside the pleadings when deciding a motion to dismiss for failure to state a claim . . . . Courts may, however, consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. For example, courts may consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.

Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (citations and internal quotation marks omitted). See also, Adedipe v. U.S. Bank, Nat'l Ass'n, 62 F. Supp. 3d 879, 901 (D. Minn. 2014) ("'Where, as here, the claims relate to a written contract that is part of the record in the case, we consider the language of the contract when reviewing the sufficiency of the complaint.'").

ERISA, as amended, "comprehensively regulates, among other things, employee welfare benefit plans that, 'through the purchase of insurance or otherwise,' provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 44 (1987) (citations omitted). ERISA provisions establish causes of action for a participant, such as Plaintiff, in an ERISA-governed insurance program, allowing a participant "to recover benefits due to him under the terms of his plan [and] to enforce his rights under the terms of the plan." See 29 U.S.C.A. § 1132(a)(1)(B).

## B. Analysis

The First Amended Complaint presents three arguments: (1) the ACA prohibits exclusion of the medical services the Plaintiff received; (2) the illegal activities exclusion in the Plan is void as against public policy; and (3) the illegal activities exclusion in the Plan is ambiguous as to what body of law determines the legality of an activity and, because Plaintiff's actions were not illegal under Wisconsin law, the injuries incurred are not excludable. (First Amended Compl., [Docket No. 18], 8-10). Plaintiff also alleges in his First Amended Complaint that he is seeking to "enjoin acts which violate ERISA and the terms of the Plan, and to obtain appropriate equitable relief." (Id. at 8). In addition to challenging the three foregoing bases for relief alleged in their Motion to Dismiss, Defendants also argue that Plaintiff has failed to state a claim that could result in equitable reformation of the Plan. (Defs.' Mem. in Supp., [Docket No. 23], 11; Defs.' Reply to Response, [Docket No. 30], 2-4).

### a. The ACA

Plaintiff alleged in his First Amended Complaint that the illegal activity exclusion denies him coverage that is an "Essential Health Benefit" which the ACA requires the Plan to provide. (First Amended Compl., [Docket No. 18], 8). Defendants argue that, as a matter of law, the ACA

does not prohibit illegal activity exclusions, so Plaintiff cannot succeed on a claim based on that ground. (Defs.' Mem. in Supp., [Docket No. 23], 16-19). Defendants contend that even if coverage of the sort Plaintiff was denied is an essential health benefit, the plain language of the ACA does not require the Plan to provide it. (Id., at 19-21). At the motions hearing, Plaintiff newly asserted additional authority under the ACA that he claims requires the Plan to provide coverage of "emergency services" such as some of the medical expenses for which Defendants denied him coverage. (September 1, 2016, Motions Hearing, Digital Recording, at 2:40-2:42).

The Court feels it necessary to note again that its resolution of the present motion does not resolve whether the ACA prevents denial of the medical coverage Defendants denied Plaintiff—it determines simply whether Plaintiff has alleged a facially plausible claim that the ACA does so. Especially when claims are highly fact dependent and implicate complex and comprehensive federal statutory schemes, the denial of a Rule 12(b)(6) motion means only that "Defendants have not shown as a matter of law that, taking the allegations of the Complaint as true," Plaintiff's claims must fail. See, Charter Advanced Servs. (MN), LLC v. Heydinger, No. 15-cv-3935 (SRN/KMM), 2016 WL 3661136, *19 (D. Minn. July 5, 2016).

### i.  Essential Health Benefits

Under the ACA, "[a] health insurance issuer that offers health insurance coverage in the individual or small group market shall ensure that such coverage includes the essential health benefits package required under section 18022(a) of this title." 42 U.S.C. § 300gg-6(a). The ACA further states:

> In this title, the term "essential health benefits package" means, with respect to any health plan, coverage that—
> (1) provides for the essential health benefits defined by the secretary under subsection (b);
> (2) limits cost-sharing for such coverage in accordance with subsection (c); and

(3) subject to subsection (e), provides either bronze, silver, gold, or platinum level
of coverage described in subsection (d).

42 U.S.C. § 18022(a)(1). The ACA defines "essential health benefits" under this subsection as

including, among other things, emergency services, hospitalization, prescription drugs,

rehabilitative services and devices, and laboratory services. 42 U.S.C. § 18022(b)(1). Both

parties originally argued that because of the language in 42 U.S.C. § 18022(a)(1), "health plans"

are required to provide Essential Health Benefits under 42 U.S.C. § 300gg-6(a). (Defs.' Mem. in

Supp. [Docket No. 23], 20; Plf.'s Mem. in Opp., [Docket No. 29], 8-9).

The ACA continues:

> **(A) In general**
> The term "health plan" means health insurance coverage and a group health plan.
> **(B) Exception for self-insured plans and MEWAs**
> Except to the extent specifically provided by this title, the term "health plan" shall
> not include a group health plan or multiple employer welfare arrangement to the
> extent the plan or arrangement is not subject to State insurance regulation under
> section 1144 of Title 29.

42 U.S.C. § 18021(b)(1).

Under 29 U.S.C. § 1144(a), but for articulated exceptions, ERISA provisions "shall

supersede any and all State laws insofar as they may now or hereafter relate to any employee

benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of

this title." Section 1144(a)(B) states in pertinent part that no ERISA-governed employee benefit

plan "shall be deemed to be an insurance company . . . or to be engaged in the business of

insurance . . . for purposes of any law of any State purporting to regulate insurance companies,

[or] insurance contracts." Therefore, under the plain statutory language, the Plan at issue before

this Court, as an ERISA-governed plan, does not fall under the definition of "health plans" which

are required by 42 U.S.C. § 300gg-6(a) to cover essential health benefits.

Despite this, Plaintiff argues that the word "any" in 42 U.S.C. § 18022(a) serves to expand the meaning of "health plan" to include even self-funded ERISA plans. See 42 U.S.C. § 18022(a) ("[T]he term "essential health benefits package" means, with respect to *any* health plan . . . . .") (emphasis added). (Plf.'s Mem. in Opp., [Docket No. 29], 20-11). This argument is unavailing. "A well[-]established canon of statutory interpretation succinctly captures the problem:  '[I]t is a commonplace of statutory construction that the specific governs the general.' That is particularly true where . . . 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 132 S. Ct. 2065, 2070-71 (2012) (citations omitted). Here, the language defining "health plan" to specifically exclude ERISA-governed plans controls over the general phrase "any health plan."

Plaintiff also cites King v. Burwell, 135 S. Ct. 2480, 2492 (2015), in which the Supreme Court held that when faced with ambiguous text in the ACA, courts should read the Act as a whole to determine provisions' meanings. (Plf.'s Mem. in Opp., [Docket No. 29], 11). He contends that because the ACA intended to guarantee essential health benefits for every American, the Court should construe the ACA as requiring even self-funded ERISA plans to provide essential health benefits. (Id. at 11-12). The Eighth Circuit has held, however, that "[w]here a congressional enactment is not ambiguous there is no need for 'indulging in uneasy statutory construction.'" United States v. Butler, 541 F.2d 730, 733 (8th Cir. 1976) (quoting Barrett v. United States, 423 U.S. 212, 217 (1976)). Unlike the ACA provisions at issue in King, the provisions regarding essential health benefits are not ambiguous. Therefore, they require no construction.

Thus, despite Plaintiff's argument, the Plan at issue here is not considered a "health plan" as a matter of law under the relevant provision of the ACA, and since the ERISA plan at issue is not a "health plan" which must cover essential health benefits under the ACA, 42 U.S.C. § 300gg-6(a) does not require the Plan at issue to do so here.

In their reply to Plaintiff's response and at the motions hearing, Defendants modified their plain-language argument. They more persuasively focused on the term "health insurance issuer" in 42 U.S.C. § 300gg-6(a), which, as stated above, mandates that "[a] health insurance issuer that offers health insurance coverage in the individual or small group market" must provide coverage including the essential health benefits package. (Defs.' Reply to Response, [Docket No. 30], 7; September 1, 2016, Motions Hearing, Digital Recording, at 2:07-09). Thus, the essential benefits requirement is limited to "health insurance issuers" that offer health insurance in the defined markets. As relevant here, the ACA defines a "health insurance issuer" as

> an insurance company, insurance service, or insurance organization (including a health maintenance organization, as defined in paragraph (3)) which is licensed to engage in the business of insurance in a State and which is subject to State law which regulates insurance (within the meaning of section 514(b)(2) of [ERISA]. Such term does not include a group health plan.

42 U.S.C. § 300gg-91(b)(2).

Since, as explained above, the Plan presently at issue is a self-funded ERISA plan not subject to State insurance laws, it is, as a matter of law, not a "health insurance issuer" that would be required to provide coverage including the essential health benefits package under 42 U.S.C. § 300gg-6(a) of the ACA. Nevertheless, at the motions hearing, Plaintiff asserted for the first time an additional source of authority for his claim that the ACA prohibits the Plain from denying coverage for at least some of the services implicated here:  42 U.S.C. § 300gg19a(b),

entitled "Patient Protections," which also requires coverage of "emergency services." (September 1, 2016, Motions Hearing, Digital Recording, at 2:40-2:42).

### ii. Emergency Services

42 U.S.C. § 300gg19a(b) states:

**(1)** If a group health plan . . . provides or covers any benefits with respect to services in an emergency department of a hospital, the plan or issuer shall cover emergency services (as defined in paragraph (2)(B))--
. . . .
**(D)** without regard to any other term or condition of such coverage (other than exclusion or coordination of benefits, or an affiliation or waiting period, permitted under section 2701 of this Act, section 1181 of Title 29, or section 9801 of Title 26, and other than applicable cost-sharing).

The ACA defines a "group health plan" as "an employee welfare benefit plan (as defined [under ERISA, 29 U.S.C. § 1002(1)]) to the extent that the plan provides medical care . . . to employees or their dependents . . . directly or through insurance, reimbursement, or otherwise." 42 USC 300gg-91(a)(1).

The Plan now at issue is an employee welfare benefit plan under 29 U.S.C. § 1002(1); therefore it is a "group health plan" under the ACA. See, 29 U.S.C. § 1002(1) (defining employee welfare benefit plan as including "any plan . . . which was . . . established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries . . . medical, surgical, or hospital care or benefits).

Accordingly, because Plaintiff has sufficiently pled that the Plan covers some services in an emergency department of a hospital, (Plf.'s Exh. 1, [Docket No. 18-1], 11-18), it is facially plausible that the ACA requires the Plan to provide "emergency services" without regard to any other condition of coverage, other than exclusion or coordination of benefits permitted under the ERISA provision for preexisting conditions (29 U.S.C. § 1181) or the IRS provision for preexisting conditions (26 U.S.C. § 9801), and other than applicable cost-sharing. See, 42 U.S.C.

§ 300gg19a(b)(1)(D). The illegal activities exclusion does not fit within the foregoing exclusions allowed under 42 U.S.C. § 300gg19a(b). Thus, if Plaintiff has adequately pled facts alleging that Defendants denied coverage of "emergency services," he has pled sufficient facts to survive in part a Rule 12(b)(6) motion to dismiss.

42 U.S.C. § 300gg-19a(b)(2)(b) provides:

> The term "emergency service" means, with respect to an emergency medical condition—
> **(i)** a medical screening examination (as required under section 1395dd of this title) that is within the capability of the emergency department of a hospital, including ancillary services routinely available to the emergency department to evaluate such emergency medical condition, and
> **(ii)** within the capabilities of the staff and facilities available at the hospital, such further medical examination and treatment as are required under section 1395dd of this title to stabilize the patient.

The "medical screening examination" referred to is an "examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency services department, to determine whether or not an emergency medical condition . . . exists." See, 42 U.S.C. § 1395dd(a); see also, 42 U.S.C. § 300gg-19a(b)(2)(A). The ACA defines "an emergency medical condition" in this context as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
> (i) placing the health of the individual . . . in serious jeopardy,
> (ii) serious impairment to bodily function, or
> (iii) serious dysfunction of any bodily organ or part.

1395 U.S.C. § 1395dd(e)(1)(A).

In addition, "stabilized" means "that no material deterioration of the [emergency medical] condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." See, 42 U.S.C. § 1395dd(e)(3)(B). Thus, the question

now before this Court is whether Plaintiff pled sufficient facts in his First Amended Complaint to support a facially plausible claim that some of the services for which coverage was denied were services used to determine whether Plaintiff had an emergency medical condition or to stabilize him if he did.

In his First Amended Complaint, Plaintiff alleged that the exploding of the mortar style firework caused "substantial injuries, including burns, to the left side of his face and shoulder area, and damage to his eyes and ears." ([Docket No. 18], 6). Additionally, he alleged that the medical care he received because of these injuries and for which Defendants denied coverage under the illegal activities exclusion cost over $255,000.00 and included "medical transportation (including air ambulance), . . . medical procedures, medicines, etc." (Id. at 7).

Taking the facts alleged in the First Amended Complaint as true and drawing all reasonable inferences in Plaintiff's favor, as required when considering a Rule 12(b)(6) challenge, it is reasonable to infer that some of the $255,000 in denied benefits were for "emergency services." The Court finds that Plaintiff has pled sufficient facts to present a facially plausible claim that at least some of the medical services for which coverage was denied by Defendants were emergency services under the ACA, for which the ACA mandates the Plan at issue provide coverage. Any question as to the full amount and nature of ERISA plan benefits in the instant case characterized as emergency services and for which the ACA may directly prohibit exclusion from coverage is properly determined later in this litigation.

At this juncture, however, the Court recommends denying Defendants' Motion to Dismiss in part to the extent that it challenges Plaintiff's allegations that the ACA prohibits exclusion of any emergency services for which the Plan denied all coverage here.

### b.  Public Policy

In the First Amended Complaint, Plaintiff also alleges that the illegal activities exclusion in the Plan is void and unenforceable as a matter of public policy because enforcement would "shift the costs of insuring much of societal conduct onto taxpayers through the use of public health and welfare funds or onto health care providers themselves." (Amended Compl., [Docket No. 18], 9). In their respective memoranda, the parties address at length their arguments on whether the illegal activities provision is void for public policy reasons, arguing the underlying merits of the issue. (Plf.'s Mem. in Opp., [Docket No. 29], 23-38; Defs.' Reply to Response, [Docket No. 30], 12-15). To survive the Rule 12(b)(6) motion currently before the Court, however, the First Amended Complaint need not present a winning argument; it need only "raise a right to relief above the speculative level." See, Twombly, 550 U.S. at 555.

However, given the history, the purpose, and the current state of the case law regarding illegal activities exclusions, the Court finds, as a matter of law, that Plaintiff cannot succeed on a public-policy challenge to the Plan's inclusion of an illegal activities exclusion.

First, the Court rejects the argument Plaintiff made at the motions hearing that the exclusion is against public policy on the facts presented here because so many other people shoot off illegal fireworks, especially on the Fourth of July. (September 1, 2016, Motions Hearing, Digital Recording, at 2:34-36). Essentially, Plaintiff asks the Court to declare the illegal acts exclusion inapplicable to his injuries because he believes that the criminalization of exploding fireworks in Minnesota in celebration on the Fourth of July is contrary to public policy because so many others also engage in similar conduct which violates the law. As the Eighth Circuit has clearly noted, however, "it is the duty of the legislative branch to make the law. We must refuse to infringe on the legislative prerogative of enacting statutes to implement public policy. The

problems of public policy are for the legislature." <u>United States v. White Plume</u>, 447 F.3d 1067, 1072 (8th Cir. 2006).

As Plaintiff concedes, the State of Minnesota has seen fit to criminalize the sort of firework by which Plaintiff was undeniably injured. (September 1, 2016, Motions Hearing, Digital Recording, at 2:29-31). The fact that other people may also have been breaking that law does not empower or convince the Court to find the illegal activities exclusion void as against public policy here. <u>See</u>, <u>In re Catfish Antitrust Litig.</u>, 908 F. Supp. 400, 417 (D. N.D. Miss. 1995) ("As every mother eventually tells her child, simply because 'everyone else is doing it' is not an absolute defense and does not mean that [one] can avoid the legal consequences of [his] actions.").

Second, a survey of relevant federal and state case law shows that courts generally interpret similar illegal activities exclusions and acknowledge the public policy which actually supports such exclusions. <u>See, e.g.</u>, <u>Safeway Ins. Co. of La. v. Gardner</u>, 191 So. 3d 684 (La. App. 2016) (holding that illegal acts exclusions in automobile insurance coverage "serve a separate public policy interest of prohibiting persons from insuring themselves against their own intentional or criminal acts [and w]ithholding insurance coverage for intentional or criminal acts helps to disincentivize such conduct"); <u>Weissman v. First UNUM Life Ins. Co.</u>, 44 F. Supp. 2d 512, 520 (D. S.D. N.Y. 1999) (noting that the public policy behind indemnifying a wrongdoer for "wrongful conduct is to avoid encouraging the wrongful conduct by removing the risk of loss").

When courts decline to enforce illegal activities exclusions, they generally do so based on the specific language of an exclusion at issue in that case; they do not broadly hold all such exclusions invalid as contrary to public policy. <u>See, e.g.</u>, <u>Bekos v. Providence Health Plan</u>, 334

F. Supp. 2d 1248, 1253-58 (D. Or. 2004) (reviewing other cases that examined the language of illegal act exclusions and determining that the exclusion in the ERISA plan then at issue was, because of its language, ambiguous); Healthwise of Ky., Ltd. v. Anglin, 956 S.W.2d 213, 215-17 (Ky. 1997) (affirming an illegal activities exclusion was unenforceable because its language was vague and ambiguous). In addition, where courts enforce such illegal activities exclusions, they also generally depend on the exclusion's specific language; broad public policy does not control those decisions. See, e.g., SGI/ARGIS Emp. Benefit Tr. Plan v. Canada Life Assurance Co., 151 F. Supp. 2d 1044, 1045-49 (D. E.D. Ark. 2001) (enforcing an illegal activities exclusion because its language was unambiguous and excluded coverage for the act in question).

The Court holds that Plaintiff's broad, overreaching public policy argument fails as a matter of law, and it recommends granting Defendants' Motion to Dismiss to the extent that it challenges Plaintiff's argument that public policy requires voiding the Plan's illegal activities exclusion.

### c. Ambiguity

Defendants argue that ignition of a mortar-style firework violates Minnesota law and a local ordinance,[4] and, at the motions hearing, Plaintiff agreed. (September 1, 2016, Motions Hearing, Digital Recording, at 2:29-31). Since Plaintiff admits that the Plan medical coverage at issue was for injuries sustained as a result of lighting the firework, Defendants assert that his claim for relief cannot succeed because the Plan's unambiguous language denies coverage for injuries resulting from illegal activities. (Defs.' Mem. in Supp., [Docket No. 23], 6-7). Plaintiff, on the other hand, argues that the provision at issue is ambiguous because it does not indicate

---

[4] Minn. Stat. § 624.21 prohibits the possession, use, and explosion of fireworks, which Minn. Stat. § 624.20 defines to include "any article prepared for the purpose of producing a visible or an audible effect by combustion, explosion, deflagration, or detonation." Plaintiff does not dispute that the device that caused his injuries was a "firework." The punishment for violating the fireworks prohibition may include fines of up to $3,000 and imprisonment of up to 1 year, depending on the gross container weight of the fireworks.

which body of law determines illegality—Federal law, because the Plan is subject to ERISA; Minnesota law, because that is where the explosion occurred; or Wisconsin law, because Choice Products and BPA are located there. (Plf.'s Mem. in Opp., [Docket No. 29], 15-16). The Plan contains no choice of law provision.[5]

Whether the Plan is ambiguous as to which body of law determines legality is a threshold question the Court may consider in the context of a Rule 12(b)(6) motion. See, Costley v. Thibodeau, Johnson & Feriancek, PLLP, 259 F. Supp. 2d 817, 836 (D. Minn. 2003) (determining ambiguity in ERISA-governed benefits plan as a question of law). If the Court determines that the provision is ambiguous, however, the actual and ultimate interpretation of an ambiguous provision is a question of fact which is not properly disposed of in a motion to dismiss for failure to state a claim. See, BB Motor Sales, LLC v. General Motors, LLC, Case No. 14-cv-5093 (MJD/JJK), 2015 WL 4077593, at *7 (D. Minn. July 6, 2015) (stating where there are differing and fair interpretations of contractual provisions, dismissal of claim dependent on that interpretation was not appropriate for dismissal under Rule 12(b)(6)); Erker v. American Cmty. Mut. Ins. Co., 663 F. Supp. 2d 799, 805 (D. Neb. 2009) (examining an ERISA-governed benefits plan and noting that "'the interpretation of an ambiguous contract presents a question of fact'").

Conversely, when the language of an ERISA-governed benefits plan is clear and unambiguous, courts should not accept a contrary interpretation. See Lickteig v. Bus. Men's Assurance Co. of Am., 61 F.3d 579, 585 (8th Cir. 1995) (noting multiple cases in agreement with this rule). Defendants argue that the illegal-activity exclusion now at issue is clear and

---

[5] Plaintiff contends, without citation to any legal authority, that the Court must construe any ambiguity in his favor. (Plf.'s Mem. in Opp., [Docket No. 29], 16). However, as the Defendants point out, the Eighth Circuit has held that utilizing a "rule of construction requiring that ambiguities in insurance contracts be resolved in favor of the insured" would violate ERISA's provisions and thus cannot be used to interpret plan terms under ERISA. (Mem. in Support of Motion to Dismiss, [Docket No. 23], 7); Brewer v. Lincoln Nat. Life Ins. Co., 921 F.2d 150, 153 (8th Cir. 1990), cert. denied 501 U.S. 1238 (1991).

unambiguous and should be afforded its plain meaning. (Mem. in Support of Motion to Dismiss, [Docket No. 23], 7). It does not appear that the Eighth Circuit has directly addressed whether the exclusion from coverage of "illegal acts" is ambiguous, much less whether a Plan provision may leave unstated which jurisdiction should establish what acts are "illegal" when there may be multiple jurisdictions involved. Thus, both parties turn to other courts for guidance.

Defendants cite Tourdot v. Rockford Health Plans, Inc., 439 F.3d 351, 354 (7th Cir. 2006), in which the Seventh Circuit affirmed summary judgment in a case involving exclusion of benefits under an illegal act exclusion provision in an insurance policy not governed by ERISA. (Defs.' Mem. in Supp., [Docket No. 23], 7). The insurance policy there excluded "'[s]ervices which result from war or act of war, whether declared or undeclared, or from participation in an insurrection or riot, or in the commission of an assault, felony, terrorist action, or any illegal act." Tourdot, 439 F.3d at 353. The Seventh Circuit upheld the district court's conclusion that the phase "illegal acts" in the exclusion was not ambiguous, holding that "'illegal acts' has a plain meaning; it simply refers to any activity contrary to law." 439 F.3d at 354.

Defendants also cite Vann v. Cent. Benefits Nat'l Life Ins. Co., Case No. 96CV155-D-, 1997 WL 560955, at *1-2 (N.D. Miss. 1997), which addressed the denial of coverage based on an illegal acts exclusion in an ERISA-governed life insurance policy. (Defs.' Mem. in Supp., [Docket No. 23], 7). Vann is less apposite, however, because the Vann court decided cross-motions for summary judgment under Rule 56 and construed the illegal activity provision using canons of contract construction. 1997 WL 560955, at *4-5. Here, the Court considers a Rule 12(b)(6) motion. If the illegal activities exclusion provision is ambiguous, as noted above, the actual interpretation on the merits is best left for another day.

For his part, Plaintiff points out that some jurisdictions have found the phrase "illegal act" or similar phrases ambiguous. (Plf.'s Mem. in Opp., [Docket No. 29], 20-21). For example, he cites Shelby Cty. Health Care Corp., 581 F.3d at 362, in which the Sixth Circuit examined the following provision in an ERISA-governed health plan:

> This Plan does not cover and no benefits shall be paid for any loss caused by, incurred for or resulting from . . . [c]harges for or in connection with an injury or illness arising out of the participation in, or consequence of having participated in, a riot, insurrection or civil disturbance or being engaged in an illegal occupation or the commission or attempted commission of an illegal or criminal act.

The court concluded that the term "illegal act" in the exclusionary provision was ambiguous because "an illegal act could be limited to violations that result in a citation or rise to a certain level of wrongdoing or could encompass all acts contrary [even] to [civil] law." Id. at 370.

Plaintiff also cites Bekos, 334 F. Supp. 2d at 1251, in which the United States District Court for the District of Oregon addressed the clarity of a provision in an ERISA-governed health plan that excluded coverage for services that:

> Relate to any condition sustained as a result of engagement in an illegal occupation, the commission or attempted commission of an assault or other illegal act, a civil revolution or riot, duty as a member of the armed forces of any state or country, or a war or act of war which is declared or undeclared.

The court in Bekos ultimately held that the phrase "other illegal act" was ambiguous "with regard to the level of [criminal] offense which will trigger the exclusion" and "with regard to whether any third-party action is required to trigger the exclusion." Id. at 1256.

Plaintiff argues that the illegal acts provision at issue here is likewise ambiguous because it is unclear whether Minnesota, Wisconsin, or Federal law applies to determine what constitutes an "illegal act." First, he points to the following provision from the Plain: "**Applicable Law**: This is a self-funded benefit plan. The Plan is funded with Employee and/or Employer contributions. As such, when applicable, Federal law and jurisdiction preempt State law and

jurisdiction." (First Amended Compl., Exhibit 1, [Docket No. 18-1], 68). Plaintiff contends that this provision means that Federal law alone determines what is illegal for the purposes of the illegal-activity exclusion. (Plf.'s Mem. in Opp., [Docket No. 29], 17).[6]

Plaintiff acknowledges that he knows of no federal law making illegal his attempt to ignite a mortar style firework at his residence in Minnesota and any such law "would likely be unconstitutional as beyond an enumerated exercise of power." (Id. at 17). The Court notes, however, that federal silence does not lead to the conclusion that Congress determined an act should not be illegal. As the United States Supreme Court has held: "[P]reemption jurisprudence explicitly rejects the notion that mere congressional silence on a particular issue may be read as preempting state law." Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 616 (1997).

Plaintiff also argues that if State law is applicable, Wisconsin law controls because Wisconsin is "the employer's home location." (Id. at 17). In support, he cites Brake v. Hutchinson Tech. Inc., 774 F.3d 1193 (8th Cir. 2014), and Hamilton v. Standard Ins. Co., 516 F.3d 1069 (8th Cir. 2008). (Plf.'s Mem. in Opp., [Docket No. 29], 17). Neither of these cases is apposite on the present record.

In Brake, Minnesota law was applicable because "the [group disability insurance] plan language states that it is governed by the laws of Minnesota." 774 F.3d at 1197. Here, there is no such choice of law provision.

In Hamilton, the case concerned a suicide exclusion provision in a life insurance policy issued to an employing company who provided coverage for its employees. When the insurance company paid the deceased employee's spouse reduced benefits because the employee had

---

[6] The undersigned believes that the language relied on by Plaintiff simply means that ERISA and other federal statutes affecting employee benefit plans will control over state law, not that federal law (or the lack thereof) shall, through the Plan, trump state criminal statutes.

committed suicide, the spouse filed suit, invoking a Missouri statute that largely prohibited the defense that the insured committed suicide in lawsuits based on life insurance policies issued to citizens of Missouri. 516 F.3d at 1070-72. In affirming the district court's interpretation of the state statute as inapplicable, the Eighth Circuit based its decision on its conclusion that the life insurance policy had been issued to the employing company, which was not a Missouri citizen, and not to the deceased employee, who was. 516 F.3d at 1073. This is not the same as holding that the law of the employer's "home location" controls.

Nevertheless, keeping in mind that survival of a Rule 12(b)(6) motion requires only that the Complaint allege facts that support a facially plausible claim, Plaintiff has adequately pled that the Plan's illegal activity exclusion is ambiguous with regards to which body of law shall define and determine which acts are illegal. Whether the language will ultimately be construed or applied in Plaintiff's favor is an ultimate question of fact on the merits yet to be determined.

Therefore, the Court recommends denying Defendants' Motion to Dismiss to the extent that it alleges the language of the Plan unambiguously prevents Plaintiff from recovery on any of his claims.

### d. Equitable Reformation

Finally, in his First Amended Complaint, Plaintiff seeks "to enjoin acts which violate ERISA and the terms of the Plan, and to obtain appropriate equitable relief." (First Amended Compl., [Docket No. 18], 8). Defendants argue, however, that Plaintiff is actually attempting to *reform* the terms of the Plan by eliminating the illegal activities exclusion, and that he has failed to state a claim for equitable reformation under ERISA. (Defs.' Mem. in Supp., [Docket No. 23], 11; Defs.' Reply to Response, [Docket No. 30], 2). Defendants cite the controlling case on

ERISA-plan equitable reformation:  CIGNA Corp. v. Amara, 563 U.S. 421 (2011). (Defs.' Mem. in Supp., [Docket No. 23], 11-12; Defs.' Reply to Response, [Docket No. 30], 2-4).

In Amara, the United States Supreme Court held that 29 U.S.C. § 1132(a)(1)(B) does not authorize a court to alter the terms of a plan, "at least not in the present circumstances, where that change, akin to the reformation of a contract, seems less like the simple enforcement of a contract as written and more like an equitable remedy." 563 U.S. at 436. Noting that contract reformation was traditionally a form of equitable relief used to prevent fraud, 563 U.S. at 440, the Court explained that equity courts granted reformation

> to reflect the mutual understanding of the contracting parties where "fraudulent suppression[s], omission[s], or insertion[s]" "material[ly] . . . affect[ed]" the "substance" of the contract, even if the "complaining part[y]" was negligent in not realizing its mistake, as long as its negligence did not fall below a standard of "reasonable prudence" and violate a legal duty.

563 U.S. at 443 (internal citations omitted). The Court then held that reformation of the terms of a Plan to conform with ERISA requirements where fraud was present was a type of remedy that falls within the scope of the "appropriate equitable relief" in 29 U.S.C. § 1132(a)(3). 563 U.S. at 442. Accordingly, under Amara, in order to obtain equitable relief under 29 U.S.C. § 1132(a)(3), Plaintiff must show "some level of fraud."

Because the First Amended Complaint does not allege any fraud, Defendants ask the Court to dismiss any claim Plaintiff is making for reformation of the Plan under ERISA. (Defs.' Mem. in Supp., [Docket No. 23], 12). Plaintiff takes the opposite stance, arguing that a showing of fraud is not required to succeed on his claim for equitable relief because "striking or severing an illegal contract provision does not depend on first finding that the illegal provision was obtained through fraud of [sic] mistake." (Plf.'s Mem. in Opp., [Docket No. 29], 39-40).

The cases Plaintiff cites, however, are neither controlling nor persuasive. One does not involve severability of clauses. See, McMullen v. Hoffman, 174 U.S. 639, 670 (1899) (refusing to enforce an entire contract as illegal and not reforming the contract). Others involved severability but not under ERISA. See, American Ry. Express Co. v. Lindenburg, 260 U.S. 584, 589-90 (1923)(noting that even if certain challenged terms on a receipt were illegal, they could be severed, leaving the rest of the receipt valid, including the terms at issue); Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 722 (5th Cir. 1995) (severing an invalid clause of an indemnity agreement instead of invalidating the entire agreement); In re Otto's Liquor, Inc., 321 F. Supp. 160, 163 (D. Minn. 1970) (noting that illegal contract provision are severable in a bankruptcy case involving anti-trust defenses by a bankrupt liquor dealer); Hartford Acc. & Indem. Co. v. Dahl, 278 N.W. 591, 593 (Minn. 1938) (reversing an order sustaining defendant's general demurrer and noting that illegal contract clauses are generally severable from a contract).

Plaintiff also cites some cases that involve ERISA-governed plans, but they were decided prior to the United States Supreme Court's decision in Amara. For example, in Prudential Ins. Co. of Am. v. Doe, 140 F.3d 785, 791 (1998), the Eighth Circuit disregarded a choice-of-law provision because "parties may not contract to choose state law as the governing law of an ERISA-governed benefit plan." In Saltarelli v. Bob Baker Grp. Med. Tr., 35 F.3d 382, 387 (9th Cir. 1994), the Ninth Circuit affirmed the invalidation of an exclusion in an ERISA-governed health benefits plan under the reasonable expectations doctrine, holding that the exclusion in question "was not clear, plain, and conspicuous enough to negate [the layman plaintiff's] objectively reasonable expectations of coverage." See, also Iwata v. Intel Corp., 349 F. Supp. 2d 135, 142 (D. Mass. 2004) (allowing equitable reformation of an ERISA-governed contract to read out the offending clause). However, Amara now controls. In the proceedings in Amara, on

remand and upon the subsequent appeal, the federal courts involved required a showing of fraud and mistake to obtain equitable reformation under ERISA. The United States District Court for the District of Connecticut applied traditional concepts of contract reformation, analyzing whether CIGNA had engaged in fraud or similarly inequitable conduct that resulted in the plaintiffs' mistake. Amara v. CIGNA Corp., 925 F. Supp. 2d 242, 251-54 (D. Conn. 2012). On appeal from that decision, the Second Circuit review involved in part a determination as to whether the district court had erred in concluding that plaintiffs had met their burden to show by clear and convincing evidence that CIGNA "had committed fraud or similar inequitable conduct and that such fraud reasonably caused plaintiffs to be mistaken about the terms of the pension plan." Amara v. CIGNA Corp., 775 F.3d 510, 526 (2nd Cir. 2014).

Silva v. Metro. Life Ins. Co, 762 F.3d 711, 722-23 (8th Cir. 2014) is also instructive. In Silva, the plaintiff argued that MetLife Insurance Company had, by taking premium payments, waived the provision of its ERISA-governed insurance policy upon which it later depended to deny benefits. 762 F.3d at 723. The plaintiff requested reformation of the ERISA policy, a request the Eighth Circuit found supported by Amara. 762 F.3d at 723. The Eighth Circuit noted the Connecticut District Court's actions on remand in Amara and concluded that the plaintiff in Silva could, on remand, similarly argue mutual mistake or fraud of one party and mistake of the other and so pursue his reformation relief. 762 F.3d at 723.

In light of the state of the foregoing and current case law on the issue, in order to state a claim under 29 U.S.C. § 1132(a)(3) for reformation of an ERISA-governed health benefits plan that will survive a Rule 12(b)(6) challenge, it is evident that a plaintiff must allege sufficient facts that allow the court to at least draw a reasonable, plausible inference that the plan in question fails to express the agreement of the parties, either because of fraud, inequitable conduct

of one party and mistake of the other, or mutual mistake. See <u>Amara</u>, 563 U.S. at 440-41; <u>Amara</u>, 775 F.3d at 525-26 (requiring the plaintiffs to show fraud and mistake to obtain reformation). As Defendants point out, the First Amended Complaint contains no such allegations of either fraud or mutual mistake. (Defs.' Mem. in Supp., [Docket No. 23], 12-13).

Therefore, Plaintiff has failed to plead sufficient facts that state a claim upon which relief could be granted under 29 U.S.C. § 1132(a)(3). The Court recommends granting Defendants' Motion to Dismiss to the extent that it challenges Plaintiff's ability to seek equitable reformation of the ERISA Plan at issue under 29 U.S.C. § 1132(a)(3).

## III.   CONCLUSION

A. Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendants' Motion to Dismiss, [Docket No. 8], be **DENIED AS MOOT**; and

2. Defendants' Motion to Dismiss, [Docket No. 21], be **GRANTED IN PART AND DENIED IN PART**, as set forth above.

Dated: October 20, 2016                              s/Leo I. Brisbois
                                                    The Honorable Leo I. Brisbois
                                                    United States Magistrate Judge

## N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.